[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
By petition filed 4/25/90, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Ana Mo. and Carlos Me., mother and acknowledged father of Guillermo M., a child born 2/7/87 who has spent all but 10 months of his life as a foster child of the petitioner. The petition alleges, pursuant to Sec. 17-43a (Conn. Gen. Stats., Rev. 1989), which applies to children previously committed to DCYS as neglected, abandonment by the father, physical abuse constituting prima facie evidence of acts of parental omission sufficient for the termination of parental absence of any ongoing parent-child relationship with any further delay in the establishment of such relationship deemed detrimental to the best interest of the child. (Subsection (b), Sec. 17-43a).
At the initial hearing on 5/22/90, required to be held within 30 days of filing under subsection (a) of Sec. 45-61d, (incorporated by reference in Sec. 17-43a(b)), both parents appeared, the father accompanied by the attorney who had represented him in an earlier neglect proceeding concerning this child. Personal service by the sheriff was confirmed as to the mother, but no return had been made as to service on Carlos, who was thereupon duly served in hand in the courtroom. A pro forma denial was entered by the court suo moto on behalf of the mother and an attorney appointed to represent her in view of the withdrawal, at her request, of two previous attorneys of record in prior proceedings. Having been served on the date set for initial plea, Carlos, with the advice of counsel, declined to CT Page 3764 enter his plea at the same time, asserting his right under subsection (c) of Sec. 45-61d to 10 days notice before "the hearing." To accommodate this assertion, a date for a continued hearing as to him only was set for 6/5/90.
On 5/31/90, Carlos moved to dismiss the petition, asserting lack of subject matter and personal jurisdiction, insufficient process and insufficient service of process because of his failure to be served 10 days before the initial hearing of the petition. On 6/5/90 Carlos entered his pro formal denial to the allegations of the petition, and a week later, following argument thereon, his motion to dismiss was denied:
(1) — The technical requirements of Sec. 45-61d had been fully met. Pursuant to subsection (a), the court had set a time and place for the first hearing on the petition not more than 30 days after filing. Nothing precludes this, or any, court from continuing a matter to subsequent dates. The date for Carlos to answer to the allegations of the petition was continued to fourteen days after he received personal service.
(2) — The purposes of the time requirements of Sec. 45-61d were fully met: An initial hearing was held within 30 days to initiate the court processing of the petition without delay. At the same time, since Carlos had not had at least 10 days after being served to make his initial response to the petition, he was granted a two week continuance for this purpose.
(3) — Even if the technical requirements of the section had not been met, so long as the father's case was not prejudiced by the failure, this court would not lack jurisdiction. It is clear by reading the balance of subsection (c) of Sec. 45-61d, which permits the court to order notice by registered or certified mail or even by publication wherever "personal service cannot be reasonably effected within the state," that these time requirements are directory, not mandatory.
Since they are not of the essence of the statute but are merely "designed to secure order, system and dispatch in the proceedings," failure to comply does not invalidate the action. In re Adrien C., 9 Conn. App. 506, 510 (1987).
Due to the unavailability of various necessary participants an original trial date of 8/15/90 was continued to 10/2/90, concluding on 10/30/90, at which time Carlos executed a written consent to the termination of his parental rights. The parties waived oral and written argument so that the period of reserved CT Page 3765 decision commenced on 10/30/90.
Facts
Evidence offered at two days of trial, interpreted in light of the prior record in this court concerning the child, supports the following findings of fact:
a. Family background
Ana Mo. had been involved with mental health services since first moving to Hartford from Massachusetts at the age of 17. She had been referred to the Mental Health Clinic in Holyoke, Mass., because of difficulties at school and at home where "she kept threatening to kill two of her siblings." (Neglect Trial: Status Exh. D, 4/5/88, 6th page). in the summer of 1982, while working in a day care center, she had told her therapist that "the stress was such that she could `kill' some of the children." (Id, 7th page). While in treatment in Hartford, her therapist received a report from her school that she had been hallucinating at the same time she was telling her therapist that she was having visions of "ugly faces". She was referred to DCYS two years later on her mother's complaint that she was abusing her first child, a son named Carlos Me. born 12/26/64. (Id., 1st page). She attended six out of fourteen scheduled sessions at Child and Family Services, bringing her child to every session. The therapist observed her interactions with him to be "kind of rough but loving", involving pulling and grabbing him on every occasion. (Neglect Trial, testimony of Josephine Ouchakoff, 4/8/88). The case was closed with this therapist after a few months, Ana having become pregnant again and the eldest child appearing to be well cared for overall. Concern was expressed, however, by her therapist because of her resort to physical punishment, even of infants:
 "Knowing that Ana and all her family are basically violent people, I spent some time educating Ana on alternatives to physical punishment."
Neglect trial. State's Exh. D, 4/5/88, closing summary). Ana's second son was born 4/24/86 and no referrals were ever made as to his care.
b. Guillermo — from birth to commitment (2/7/87 to 5/9/88)
Guillermo was born three months premature on 2/7/87, the third son born to his 21 year old mother and Carlos Me. in little over two years. The father did not acknowledge paternity of Guillermo until he was a year old, five months after institution of the neglect proceeding alleging him to be abused. CT Page 3766 (Neglect Trial: State's Exh. C, 3/3/88). Neither parent has asserted that he has ever lived in any apartment occupied by Guillermo and his mother.
Due to the many problems of prematurity, Guillermo spent his first two months of life in the hospital. He went home with his mother in early April, 1987, with home assistance provided by professionals from the Hartford Department of Health Services, the VNA and a homemaker provided by the VNA. While a Health Services professional noted Ana's "short fuse" with her children, no physical discipline had ever been observed. Ana cooperated with these services for four months until the homemaker told her that the VNA had asked her to be alert for signs of child abuse. After that conversation, Ana refused the VNA or its homemaker access to her home.
On 9/1/87, five months after being placed in his mother's home and one month after homemaker services were discontinued, Guillermo was brought into Hartford Hospital Emergency Room with a complaint of a swollen left leg. (In her testimony eight months later, on 5/9/88, Ana recalled bringing him to the hospital because of a swollen penis.) Ana told hospital staff she had left the child with her mother that day, and suggested that her two year old eldest son might have climbed into the crib during that time. A complete examination revealed fractures not only to the left leg but numerous other fractures of varying ages and stages of healing: The knees of both legs; both shoulders; both ankles; the right arm. All were "bucket handle" fractures caused not by impact but by grabbing, twisting and pulling. The pediatrician testified that there was no medical or genetic basis for these fractures and therefor they were "without a doubt caused by child abuse." (Neglect trial: testimony of Dr. Katz, 9/22/87).
When Guillermo was able to leave the hospital, DCYS filed coterminous petitions pursuant to subsection (e) of Sec. 17-43a alleging him to have been the victim of physical abuse serious enough to constitute prima facie grounds to terminate his parents' rights under subsection (f) of Sec. 45-61f applicable to children not previously committed to DCYS. In connection with that proceedings, a psychological evaluation was conducted by a bilingual clinical psychologist who recommended return to the mother. (Neglect trial: Respondent's Exh. 1, 5/5/88 and testimony given on that date). To Dr. Ramos-McKay, Ana had admitted that she frequently became angry, still had a "short just", threatened to hit her children (then aged 1, 2 and 3) for discipline when they moved around while watching television, and acknowledged no need for treatment. By this time, Ana was alleging that it was the paternal grandmother who played roughly with the children and had probably inflicted the injuries on CT Page 3767 Guillermo. When asked why she had not mentioned this theory months before when the injuries were first being investigated, Ana explained it was because of a past history of violence on the part of Carlos and his family. None of this, however, troubled the psychologist who recommended return to the mother since her "present evaluation does not clearly suggest that Mrs. M. inflicted the injuries." (Id, p. 4.). Despite the absence of any medical support of the theory that a two year old could have inflicted multiple fractures of varying ages by grabbing, pulling or twisting the limbs of his baby brother, Dr. Ramos-McKay felt "these injuries could have been inflicted by the oldest child, who is reported to be overactive and aggressive." (Id.) The psychologist recommended immediate return to Ana under protective supervision since she believed that if Ana were capable of abusive behavior, it would not have been directed at a docile baby but rather at an active older child, concluding "I was not convinced mother had done it." (Neglect trial. testimony of Ramos-McKay, 3/5/88).
In the eight months following the filing of these coterminous petitions, Carlos acknowledge paternity, the termination petition was withdrawn by the petitioner upon receipt of the psychologist's recommendation, and the child was adjudicated to have been physically abused while in the custody of the parents, within three of the definitions found in Sec.46b-120: He had physical injuries inflicted upon him other than by accidental means; he had injuries which were at variance with the history given of them; he was in a condition which was the result of maltreatment such as . . . cruel punishment. Following a contested hearing on disposition, Guillermo on 5/9/88 was committed to DCYS for an initial period of 18 months, pursuant to subsection (d) of Sec. 46b-129. The court enumerated expectations antecedent to the return of the child to Ana's care: Visitation; counselling at Child and Family Services; cooperation with DCYS. Three months later, at Ana's request, a review of the situation was held in court and Ana, claiming to be unable to get along with the Child and Family Services counsellor, was given permission to seek comparable counselling elsewhere.
 c. From commitment to the institution of this action (5/8/88 — 4/25/90).
In March of 1989, Ana filed a petition to revoke Guillermo's commitment alleging compliance with the court's expectations and that continuation of the child's foster placement was no longer in his best interests. An updated evaluation was ordered and conducted prior to a pre-trial conference on 8/24/89. On 8/31/89, with the agreement of all parties, a plan was outlined for the child to be returned to his CT Page 3768 mother, who had agreed earlier to the extension of his commitment for a second 18 month period, effective upon expiration of the first on 11/9/89, without prejudice to her pending petition to revoke.
Guillermo was returned on 9/22/89 to his mother who promised cooperation with a Home Based Program which would provide extensive transitional services. Newington Children's Hospital (NCH) was asked to begin a comprehensive developmental assessment of the child with recommendations for melting his needs. At the first appointment scheduled at NCH, hospital staff noted and reported to DCYS an irregularly shaped burn on the child's left thigh. DCYS investigated and, apparently accepting the mother's explanation that the child had bumped against a heater, it investigated no further. Guillermo remained at home with his mother and two older brothers until 2/8/90 when he was returned to NCH for the second scheduled appointment in the evaluation. This time the child appeared with multiple bruises, most of them burns at varying stages of healing, none of which appeared to have been of accidental origin. (State's Exh. K, 10/30/90). Asked to explain why the largest and most serious burn across his right shoulder had gone untreated for several days, Ana replied that she had not bathed the child for three days and hence had not noticed the burn until that day. Guillermo has returned to foster care following that hospitalization, and on 4/19/90 the mother's pending revocation petition was denied. Five days later, the instant petition was filed.
Testimony was given by medical professionals who observed the child on 2/8/90: Dr. Coyle, child psychologist on the NCH staff, had followed Guillermo when in foster care between the ages of 11 and 22 months, discharging him from the NCH Neonatal Infant Follow-up Program in December of 1988 when he appeared to be doing "very, very nicely", had closed the "prematurity gap" and was then functioning normally for his age. (Testimony of 10/2/90). Fourteen months later, on 2/8/90, Guillermo kept his physical distance from his mother, who reported that he refused to have his clothes removed, resisted baths, slept in his clothes. When she attempted to undress him, he resisted, then went limp. Another staff member succeeded in removing his clothes and then the burns and other bruises were discovered. Asked the origin of so many bruises, Ana first said she did not know. Later, she told NCH staff that he had pressed himself against a hot radiator. When one doctor pointed out that it would be very hard to press the the top of his shoulder against a hot radiator, without moving, long enough to incur the large burn that was observed, Ana then said it came from hot bathwater. Dr. Coyle found the child's terrified physical response to his other's approach to be "highly consistent with CT Page 3769 child abuse." (Testimony of 10/2/90). He prepared the discharge summary for the NCH team (Petitioner's Exh. C) which included the conclusion that Guillermo was "at extraordinary risk for physical injury if returned to home." (Id, p. 3). The team recommended "timely resolution of this matter and placement within a stable, safe and hopefully long term home" (Id, p. 4) and suggested being "extremely conservative in the allowance of supervised visitation." (Id.) Dr. Coyle, in direct response to a request from the DCYS social worker for a recommendation on visits by the mother, replied:
 At the time, I do not feel that visitation with the mother would be in Guillermo's best interest. Indeed, such visits may have the potential to be harmful. Given the extent of the abusive injuries Guillermo has suffered, it would be unwise to expose him to individuals or environments which are associated with the abuse, even in a supervised manner. Such expose [sic] would undoubtedly induce an inordinate degree of anxiety and insecurity which may prove to be psychologically traumatic. I strongly suggest that any consideration of visitation be curtailed until the issues of the abuse and permanent placement are firmly resolved.
(Letter, 4/6/90, State's Exh. D., 10/2/90).
Dr. Coyle conducted a psychological evaluation on 2/12/90 in which he observed "some regression since last evaluated in his foster placement" due to the adjustment required by his transfer from foster care to his mother's home, and the ensuing abuse. (State's Exh. E., 3rd page). He could not be certain if Ana had been the active abuser, or had passively permitted it to occur repeatedly, doing nothing to protect the child. On balance, however, he found Guillermo's response to her r, lost consistent with active abuse.
The staff pediatrician at NCH at the time, a Dr. Pelegano, who was no longer a resident of Connecticut at time of trial, filed a Report of Suspected Child Abuse (DCYS Form 136) on 2/20/90. His suspicion of child abuse was based upon three factors:
— 1. Multiple burns of varying ages with no clear history of causation. Even Ana admitted she was "only guessing" at the origins. — 2. The location of the burns (behind knees, mid-back, top of shoulder) and the shape (rounded) could not be explained by contact with a baseboard heater. — 3. Although Ana acknowledged that she knew the shoulder burn was severe and required treatment, she did not CT Page 3770 consult a doctor, but rather sought medical input for a minor rash, which to Dr. Pelegano "suggests a desire to hide these injuries from the medical community." (Id.)
In a separate affidavit prepared on 2/22/90, Dr. Pelegano noted not only the physical evidence of abuse, but paranoid ideation expressed by the mother: She said she believed that Dr. Pelegano was being paid by someone to take her child away; that he had been present in the earlier abuse trial when, in fact, he had not met Guillermo before 2/8/90; that Dr. Coyle's presence at NCH and at Guillermo's earlier abuse trial was part of some conspiracy which involved Dr. Pelegano; that one of the NCH drivers was following her around the hospital, watching her. These comments caused Dr. Pelegano to become ". . . concerned that the degree of paranoia expressed by Guillermo's mother was abnormal. The ideas expressed were not well-founded in reality and seemed to suggest significant psychiatric problems in the mother." (Id., p. 3). He recommended that she be assessed psychiatrically as to her ability to give adequate care to her two older children.
In addition to the documented indicia of physical abuse, Dr. Pelegano found suggestions of "emotional distress and exposure to violence" in the fact the child now showed developmental delays not present in December of 1988, interacted with violence with a playroom doll, and exhibited "violent resistance to being undressed but quiet acceptance of other interactions with strangers including physical examination." (Id.).
Pediatric Nurse Practitioner Linly also observed the 2/8/90 exam. She found it significant that when finally undressed, Guillermo had climbed into the lap of a strange pediatric resident rather than seek support from his mother. (Testimony 10/30/90). She had examined Guillermo on 12/4/89 and reported seeing then none of the marks displayed two months later on the child's thighs, shoulder, abdomen, legs and elbows. To Nurse Linly, Ana offered still other explanations: Maybe he had been hurt at the home of the grandmother; maybe the other children did it; maybe he hit the heater.
Guillermo's present foster mother testified that he resisted being bathed when he first came to her in the spring of 1990, claiming the water was too hot when it was not. He awoke nights crying, and resisted returning to sleep. The first week he had seen a man's belt, grabbed it and struck himself saying, "Okay, Mommy, I'll behave." Later he said "Mommy hit me with a belt" giving him "sores" and "hurts" on his body. When he saw another child in the home with a jewel pin, he cried "It stings! CT Page 3771 It stings! My mother stings me with that." He never spoke of his parents except in connection with the marks on his body. In the summer he resisted wearing short sleeved shirts that exposed those marks that "My mommy gave me." (Testimony of foster mother, 10/2/90).
Throughout the involvement of DCYS in this child's life, his father has never offered a plan for the child's care, other than return to the mother. During the period between the child's commitment to DCYS (5/9/88) and return to his mother (9/26/89) he had visited twice — both times in the first month of commitment. During most of the period of commitment, his whereabouts were unknown to DCYS. After Guillermo's return to foster care, DCYS had permitted the father two office visits. Guillermo was crying hard on arrival at DCYS and did not stop until he saw for himself that his mother was not present. He calmed down, but the social worker noted no parent-child interaction. The child appeared anxious to be reassured that he would not have to go home with his father and that the visit would end soon. (Testimony of social worker, 10/2/90). In August of 1990, while awaiting the trial date on the termination petition, Carlos Me. had come to the DCYS office to volunteer information: He had seen Ana take Guillermo into a bedroom and hit him with a belt (State's Exh. H.) several times, and the day after, he had seen her put Guillermo on the kitchen counter and apply hot Epsom salts to his body while the child screamed. The father gave a notarized statement at the time of making these disclosures. (State's Exh. I.). Asked why he has not intervened to protect Guillermo, Carlos replied because Ana had obtained a restraining order against him. Asked, in that case, if he has even supposed to be in Ana's home, he replied, "Not that I know of."
Testifying in her own behalf, Ana acknowledged Guillermo had backed away when she tried to undress him, but she did not know why. Despite the evidence that had been offered in professional testimony and photographs, she claimed that on 2/8/90 "He didn't have any injuries." Asked to explain the very visible marks in the photographs, she said it looked like somebody had hit him. Asked who that could have been, she replied, "To me it was his father." She believed that the father had hit the child on his shoulder. Asked why she had never disclosed this source of the injuries to the NCH staff, the police or DCYS eight months before when the injuries were first uncovered, she replied, "They won't let me talk." She claimed the loop-shaped mark on Guillermo's abdomen that Nurse Linly had not observed two months earlier was a birthmark. She said that the large healing area on his thigh was self-inflicted on the baseboard heater. Shown picture #31 (large bruises on thigh), she said she saw him inflict this on himself five months CT Page 3772 earlier, when in foster care. She claimed that on 2/6/90 she had left Guillermo with his father and returned to find the bathtub filled with very hot water, the father's belt on the sofa, and Guillermo naked in the bathroom. She had left Guillermo alone with his father, despite the fact that every year she obtained a new restraining order because of his threats and violence, only because he wanted to she his son. Still later in her testimony she claimed that some of the marks in the photographs were birthmarks or allergy scars. In cross examination she admitted she had noticed the shoulder burn but refrained from seeking medical attention because she feared he would again be removed.
Conclusions of fact:
1. Guillermo has twice in his short life been presented with all of the classic, textbook symptoms of the Battered Child Syndrome: Multiple injuries at various stages of healing from unknown origin and/or at variance with the explanation
2. He was returned to his mother after two years in foster care on the recommendation of two clinical psychologists, because there was no certainty that the mother had inflicted the first injuries, and because she had begun to visit consistently and cooperate with counselling.
3. After little over four months with his mother, Guillermo again displayed multiple injuries — not fractures, this time, but burns in places on his body that could not have happened accidentally. He also had retrogressed develop mentally and displayed terror of his mother, as well as disclosing in the neutral atmosphere of his foster home that his mother had hurt him.
4. Ana, despite months of counselling, does not acknowledge any responsibility in the multiple injuries suffered by this child before his third birthday, and even denied that the latest ones existed.
5. With a history of mental illness in her teen years, she manifested paranoid ideation at the time of her son's most recent hospitalization for child abuse.
6. If Ana had not inflicted the injuries directly on her son, she was a passive abuser by failing to protect him from repeated assaults by others; the weight of the evidence, however, is clearly on the side of ascribing to Ana the role of active abuser.
7. Carlos has been unable to protect his child, has never CT Page 3773 offered a plan for the child independent from that of the abusive mother, and has duly consented to the termination of parental rights so that the child may have a safe and permanent home.
Adjudication — On facts as of 4/25/90
This record supports by the requisite clear and convincing evidence all of the pleaded grounds for termination of the rights of both parents. As to the father:
1. His consent, having been found to be given voluntarily, knowingly and with the advice of counsel, is accepted as a ground for terminating his parental rights.
2. He failed to visit at all between June of 1988 and September of 1989 when the child returned to his mother. It is unknown how often he saw the child during the little more than four months that Guillermo was with his mother. Ana claimed he came every day, but also said she had repeatedly obtained restraining orders to keep him away from the home. While Carlos may have visited his son, he did nothing to protect him from retreated abuse, resulting in the multiple marks observed at the end of the time with the mother. This entire record, commencing with Carlos's failure to acknowledge paternity until the child was a year old, supports the conclusion that while there may not have been common law abandonment, in the sense of a total, intentional, and deliberate absence of contact there has been in the statutory sense a failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
As to the mother:
1. On two occasions this child has suffered, while in the care and custody of his mother, "nonaccidental or inadequately explained serious physical injury" which constitutes "prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights." Because the clinical psychologist in 1988 was not certain that Ana had inflicted the multiple fractures found on the body of the then seven month old Guillermo, she was permitted to work toward his return. Less than five months after that return, the child again displayed the unmistakable indicia of child abuse, only this time the child's words and conduct make it more likely than not that she was the active abuser and not CT Page 3774 merely an ineffective protector from another abuser. This record exceeds the mandated standard of clear and convincing evidence of this ground for terminating Ana's parental rights.
As to both parents:
1. Failure to rehabilitate — Carlos has never offered his home to this child. His situation in this regard is exactly as it was on 5/9/88. Ana, despite superficial adherence to the court's expectations at the time of commitment, clearly learned nothing during the 19 months that Guillermo was living — and thriving — in foster care. Her "short fuse", her misperceptions of reality, possibly even her paranoid thinking, have remained remarkably constant during Guillermo's lifetime. The child suffered multiple fractures in the five months that he lived with his mother in 1987; he suffered multiple burns in the less than five months he lived with his mother in 1989-90. These facts constitute clear and convincing proof that both parents have "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child they could assume a responsible position in the life of the child.
2. Absence of on-going parent-child relationship. — There is no question that Guillermo clearly recognizes both of his parents as his parents, and carries present memories and recollections of them. But it is equally without question that as to the mother, his memories and recollections are terrifying and debilitating to the extent that a child development specialist recommended no visitation with her, even under supervision. The existence of such a negative relationship is no barrier to termination of parental rights. In Re: Rayna M., 13 Conn. App. 23 at pg. 34-35
(1987).
 The child's knowledge of the father is less fraught with terror, but it is clearly not the kind of "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Given the long history of this case, the evidence that the child developed normally when in an adequate foster home and retrogressed, as well as suffered physical abuse, when returned to his family, it is clear and convincing that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." CT Page 3775
Disposition — on facts as of 10/30/90
Dr. Coyle recommended clearly the securing of a safe and permanent home for Guillermo without more delay. The father has consented to termination of his parental rights in order to achieve this goal. Before a court may terminate the rights of the nonconsenting mother, it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) Every available service was put at Ana's disposal to facilitate Guillermo's return to her care: Referrals made to clinics of her choice in home-based services provided; a homemaker and visiting nurse were involved in the early days; developmental experts at NCH were called upon to help her. No other services could have been provided.
(2) Ana apparently complied with the court's expectations sufficiently to permit a trial return of her son to her care. She cooperated with clinical evaluations ordered in the past, and appeared in court on every occasion.
(3) The child acted out, in full view of developmental specialists at NCH, his feeling for his mother: Terror. Later, when brought to DCYS for a visit with his father, he would not stop crying until he could see for himself that she was not there. Whatever feeling he may have for her is now negative; whatever emotional tie he has to her is a destructive one that had caused him, in just a few months in her care, to regress developmentally.
(4) Guillermo is three; he has spent all but ten months of his life in foster care. He has spent two period of less than five months each with his mother, at the end of each of which he was found to be an abused child. He should nave to wait no longer to be assured of a permanent, safe home with caretakers who will nurture, rather than abuse, him.
(5) Ana made many apparent efforts to adjust her circumstances, conduct or conditions to make it in Guillermo's best interest to return home. She visited, participated in counselling, cooperated with DCYS. But the real change that was required for Guillermo's safe return never took place: Admission of her role in the abuse of her son and engagement in realistic therapy designed to address her uncontrollable rages that have resulted in the abuse of her child.
(6) The only time Ana was prevented from maintaining a meaningful CT Page 3776 relationship with her child was following the second episode of child abuse. DCYS barred her from all contact on the recommendation of Dr. Coyle. This impediment to further contact is not unreasonable and has nothing to do with economic circumstances, but was a necessary step to prevent this child from regressing still further from the normal development he had achieved in foster care before the tragic return to his mother.
Having considered all of the foregoing, it is found to be clearly and convincingly in the best interests of this child for his parents' rights to be terminated so that he may know for the I first time in his life the security of a permanent and loving home. Therefore it is ordered that the parental rights of Ana Mo. and Carlos Me. in and to their son Guillermo M., be and hereby are terminated. And it is further ordered that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption, and to ensure this end said Commissioner is further ordered to submit to this court a written report as to the progress toward such adoption no later than 90 days after the date of this judgment, and thereafter in such form and at such intervals as may be from time to time required. If adoption is not finalized by 3/1/92, said Commissioner is further ordered to submit a Motion for Review of Plan for Terminated Child to be in full compliance with Federal law.
Appeal
Ana has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint her for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in her professional opinion it lacks merit, she is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel, who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination CT Page 3777 of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 23rd day of November, 1990.
BRENNEMAN, J.